RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

                    *Plaintiff-Appellee*,

    *v.*

IVAN CRUMP,

                    *Defendant-Appellant.*

> No. 21-6160

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:18-cr-00190—Eli J. Richardson, District Judge.

Decided and Filed:  April 11, 2023

Before:  MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

───────────────

**ON BRIEF:**  Gary W. Crim, GARY W. CRIM LAW OFFICE, Dayton, Ohio, for Appellant. Rachel M. Stephens, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

NALBANDIAN, Circuit Judge.  Responding to a "shots fired" call, officers arrived at an apartment, finding blood on the walls and items scattered everywhere.  Ivan Crump, who was incoherently mumbling and wearing nothing but a towel, was the only person inside.  A protective sweep and subsequent search led the police to find two guns, ammunition, drugs, drug paraphernalia, and several documents bearing Crump's name.  So they arrested him.  And while he was behind bars, Crump said on recorded phone calls that he had fired a gun and wanted to get back to drug trafficking.  Crump was charged and convicted of possessing a firearm and

ammunition as a felon under the Armed Career Criminal Act. He now appeals on four grounds. Finding no error, we affirm.

**I.**

At nearly 1:00 in the morning, officers dispatched to an apartment after they got a call that shots had been fired. When they arrived at the apartment, they saw its door shaking "as if somebody was trying unsuccessfully to get the door to latch . . . , attempting to close it again and again." (R. 148, Transcript II, p. 152.) With blood on the door, gun smoke in the air, and a gunshell casing at their feet, the police announced their presence.

Like that, "the door stopped moving." (*Id.*, p. 153.) So the officers knocked, and the unlatched "door swung open." (*Id.*) At this point, the officers again announced their presence. Yet they received no clear response. All they could hear was "incoherent unintelligible mumbling" in the kitchen area. (*Id.*) Still standing at the entrance with the door open, the officers could see inside. They saw blood on a pillar and broken items like a TV on the floor.[1]

After the officers' multiple requests to come outside, Crump came into view wearing a towel—nothing else. He held the towel with one hand, the other hand behind his back. For their safety, the officers repeatedly ordered Crump to show his hands. But Crump refused. So they restrained him with handcuffs and performed a protective sweep of the apartment.

The signs of a prior confrontation were in plain view—bullet holes in the TV, broken glass on the floor, more "blood splattered on the wall and the ceiling," and other items scattered all over. (*Id.*, p. 155–56.) And while performing the protective sweep of a bedroom, the officers saw a firearm and drugs in plain sight. A handgun—that turned out to be a 9mm pistol—and two mason jars filled with what appeared to be marijuana lay on opposite sides of the bed. The officers didn't seize these items just yet.

---

[1]A recorded call between Crump and an unidentified woman later identified that it was Crump's blood that was "everywhere." (Jail Call Recording 21-6160_4__51318_1200A, 00:51–00:57.) And an officer stated that Crump had "blood on his hands." (R. 148, Transcript II, p. 85.)

Besides Crump, the officers found no one else in the apartment.  So they went back outside.  Some officers stayed at the scene while others went "downtown to write up a search warrant."  (R. 147, Transcript I-B, p. 59.)

And with a search warrant in hand, they returned to look for items related to the gun and drugs they had just found.  They returned to the bedroom and found more drugs.  They located more marijuana in a duffle bag in the bedroom's closet and in a satchel next to a TV stand.  At-home drug tests were found in the bedroom's closet.  And a device used for cheating on drug tests was found in a drawer in the bathroom.

They seized the 9mm pistol and the two jars of marijuana.  And another gun, "with blood on the hand grip," sat "directly next to [the] two large mason jars."  (R. 148, Transcript II, p. 131–32.)  The officers seized that "assault or AK pistol," and later identified it as a Century Arms model RAS47 caliber 7.62x39mm pistol.  (R. 147, Transcript I-B, p. 61; R. 137, PSR, PageID 689.)  Upon further examination, a used cartridge case was ejected.  And later testing revealed that the gun-shell casing found near the entrance of the apartment had been fired from this gun.  What's more, all throughout the apartment police found another 23 rounds of the same 7.62x39mm caliber ammunition, plus 10 rounds of 9mm ammunition.

The officers continued their search of the bedroom.  Next to the gun and marijuana, a nightstand drawer contained one baggie of crack cocaine and another with a pill inside.  And directly under the bag of cocaine, officers uncovered several documents—all belonging to Crump.  They found his "birth certificate, a food stamp card in his name, envelopes containing his insurance information," a flight boarding pass with his name, and a photograph taken of him inside the very apartment the police were searching.  (R. 147, Transcript I-B, p. 45–46, 97, 124.)  In addition, the nightstand contained multiple business cards, some from Crump's parole office and another one belonging to an official that Crump had seen while on parole.

In the end, police found 870 grams of marijuana packaged for resale and 27.3 grams of crack cocaine.  Police also found multiple digital scales, a marijuana grinder, a glass pipe with marijuana residue, rolling paper, and four cell phones.  And in the living room, the officers found

a pair of bloody shorts containing a wallet with Crump's Tennessee driver's license, as well as a fifth cell phone and $356 outside the wallet.

Before trial, police forensically analyzed four of the five seized cell phones. And the government entered two of them into evidence at trial. The contacts on the two phones were almost the same—a fact the government used to suggest that they were burner phones. Tellingly, the messages on the two phones concerned drugs, money, and meeting locations. And one received message stated, "Need that AK-47." (R. 148, Transcript II, p. 258.)

An indictment charged Crump with a single count of being a felon in possession of firearms and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924. At trial, the jury heard excerpts of several jail calls that Crump made following his arrest. In one call, two unidentified individuals informed Crump that the police "got everything," including the "crack," the "Draco,"[2] "another pistol," and "a whole lot of weed." (Jail Call Recording 1__51218_15_27C, 00:23–00:40.) And on another call, someone told Crump that the police saw "cocaine, and weed, and guns in plain view," to which Crump responded, "They lyin' . . . . You know that shit was in that drawer where it's always at, man." (Jail Call Recording 21-6160_6__51318_1923D, 00:07–00:29.) When he found out that the police seized the items, he said he was "doomed." (Jail Call Recording 21-6160_2__51218_1622C, 01:00–01:33.) He reasoned that the police "got them guns, they got all this, they got the mon—they got that money didn't they?" (*Id.*, 1:29–1:33.)

In addition, the government offered recordings to show Crump's knowledge of the five seized phones. He asked someone if the police took his "trap phone," and in response, the unidentified person said that the officers confiscated "them little burner phones that was in the drawer." (Jail Call Recording 21-6160_2__51218_1622D, 00:00–00:33.) Now knowing this, he wanted bail. In his words, "time [was] ticking," and because the police took the phones, he was "the only one who knows these people" and the only one who could "collect that bread." (Jail Call Recording 6__51318_1923C, 00:13–00:36.)

The district court relied on two theories for its jury instruction on what constitutes "possessing" a firearm or ammunition: constructive possession (for both of the guns and all of

---

[2]A Draco is slang for a Draco-type firearm, an AK-type pistol common on the streets.

the ammunition) and actual possession (for the AK-style pistol and its ammunition). Crump didn't object. He did, however, ask for a special unanimity instruction stating, "If the jury is to find Mr. Crump guilty of possessing the AK-47 firearm, the verdict must be unanimous as to the theory of possession and guilt." (R. 148, Transcript II, p. 219.) But the district court declined his request. The jury then found Crump guilty of "Possession of a Firearm and Ammunition by a Convicted Felon."

For sentencing, the Presentence Investigation Report ("PSR") calculated Crump's guidelines range as 262 to 327 months. And it based this range on the conclusions that Crump qualified as an armed career criminal under 18 U.S.C. § 924(e) and possessed a firearm in connection with a controlled substance offense. Crump objected to these conclusions, arguing that he didn't possess the firearms and ammunition "in connection with" a drug offense. But the district court overruled Crump's objection. And after considering the 18 U.S.C. § 3553(a) factors, the court varied his sentence downward to 210 months' imprisonment. Crump timely appealed.

**II.**

Crump first challenges whether the government provided sufficient evidence to support his conviction under 18 U.S.C. § 922(g)(1). To obtain that conviction, the government had to prove beyond a reasonable doubt that Crump was a felon and knew of his felon status, that he knowingly possessed a firearm, and that the firearm traveled through interstate commerce. *See United States v. Ward*, 957 F.3d 691, 696 (6th Cir. 2020). The only element in dispute was whether the jury could reasonably find that Crump knowingly possessed a gun. He says he didn't possess one, either actually or constructively. But there were two guns in the apartment, and a rational juror could have found that Crump possessed each of them.

Crump faces an "uphill climb" in challenging the jury's verdict. *United States v. Latimer*, 16 F.4th 222, 225 (6th Cir. 2021). To test the sufficiency of the evidence, we "must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012). And we review all evidence "in the light most favorable" to the government. *Id.* So much so

that "every reasonable inference from the evidence must be drawn in the government's favor." *United States v. Woods*, 877 F.2d 477, 479 (6th Cir. 1989). And we can look to circumstantial evidence alone to meet this test. *Washington*, 702 F.3d at 891.

We recognize two forms of possession: actual and constructive. *See Latimer*, 16 F.4th at 225. And although the "line of demarcation" between them is not always "analytically crisp," *United States v. Walker*, 734 F.3d 451, 456 (6th Cir. 2013), either can sustain a verdict, *United States v. Moreno*, 933 F.2d 362, 373 (6th Cir. 1991). Any rational juror could find that Crump actually possessed the Draco and constructively possessed both of the guns and the ammunition. We'll take each in turn.

First, actual.[3] A person actually possesses a gun if he at some point has "actual and physical control" over the gun. *United States v. Brooks*, 987 F.3d 593, 601 (6th Cir. 2021) (quoting *Black's Law Dictionary* 1046 (5th ed. 1979)). "[N]othing in the word 'possess' requires a defendant to *retain* control of the gun for any lengthy period of time." *Id.* Simply put, actual possession doesn't have a "minimum temporal prerequisite." *Id.* (citation omitted). So any reasonable juror could find that Crump violated § 922(g) if he had knowing control of a gun "at a given time." *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009) (citation omitted).

Direct and circumstantial evidence supports that Crump possessed at least one gun—the Draco—when he fired it right before the police arrived. Viewing Crump's recorded jail conversations "in the light most favorable to the [g]overnment," any rational juror could find that Crump admitted to actually possessing a gun. *Washington*, 702 F.3d at 891. He shot up the place with one or both guns. (Jail Call Recording 21-6160_5__51318_1909D, 00:55–01:08 (acknowledging that he had "shot that gun")[4]; Jail Call Recording 21-6160_4__51318_1200D,

---

[3]Crump argues that the government provided no evidence of actual possession because no one saw him with a gun in hand. True, police found both the Draco and 9mm pistol in a bedroom on opposite sides of the bed— outside of Crump's "immediate control" at the moment they saw him. *United States v. Brooks*, 987 F.3d 593, 602 (6th Cir. 2021) (citing *United States v. Morrison*, 594 F.3d 543, 545 (6th Cir. 2010)). But because "possession" doesn't require a defendant to *retain* control over a firearm, prior possession before the police came can suffice. *Id.* And as discussed below, the government had enough evidence that Crump had actually possessed the Draco.

[4]Crump argues against this characterization of the recording, trying to reframe his statement as anything but an admission. But doing so would reverse our standard of review. "[E]very reasonable inference from the evidence must be drawn in the government's favor." *Woods*, 877 F.2d at 479. In any case, the jury had many more of Crump's admissions to rely on.

01:35–01:41 ("I fucked myself up, fucked your house up, and look like an idiot in jail[.]"); Jail Call Recording 21-6160_2__51218_1622C, 00:00–00:06) (discussing how he "fucked both of the TVs," one of which had bullet holes in it).) And the Draco might have even had Crump's blood on the handle. (Jail Call Recording 21-6160_4__51318_1200A, 00:51–00:57 (noting that Crump's blood was "everywhere"); *see also* R. 148, Transcript II, p. 85 ("He had blood on his hands, I think kind of up his forearms."); *id.* at 131–32 (noting that the Draco had "blood on the hand grip").)

Moreover, other evidence would allow a rational juror to fill in the blanks. The only reason the officers showed up in the first place was because of a "shots fired" call. And they confirmed that the noise came from a gun. Along with the scent of gun powder in the air, they found a gun shell on the floor—not to mention the two firearms by the drugs and the ammunition all throughout the apartment. And the only person there—Crump. No evidence existed of any alternative shooter. So we have a gun with blood on the handle, evidence that the gun had just been fired, and Crump—who had blood on his hands and admitted to firing a gun. Any rational juror could do the math. A juror could reasonably infer that Crump actually possessed the Draco when he fired it.

Second, constructive possession. It "exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Moreno*, 933 F.2d at 373 (citation omitted). Importantly, the presence of a person near guns "alone cannot show the requisite knowledge, power, or intention to exercise control over the [] firearms." *Bailey*, 553 F.3d at 945 (citation omitted).

But "the quantum of evidence necessary to" establish constructive possession when a person is in close proximity to the item at issue "is minimal." *United States v. Walker*, 734 F.3d 451, 456 (6th Cir. 2013). "[O]ther incriminating evidence, coupled with presence" can "tip the scale in favor of sufficiency." *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (citation omitted). And the government can tip that scale with "either direct or circumstantial evidence." *United States v. Newsom*, 452 F.3d 593, 609 (6th Cir. 2006).

Along with the evidence described above, two other forms of evidence are particularly relevant here.  To start, Crump's knowledge of the guns.  "[T]he jury was entitled to find that [Crump] knew full well that the gun[s] w[ere] there."  *Morrison*, 594 F.3d at 545.  That's because his recorded conversations from jail handed the government this evidence on a silver platter.  They demonstrated Crump's familiarity with the guns seized by the police.  (Jail Call Recording 1__51218_15_27C, 00:23–00:40 (talking about the "Draco" and "another pistol"); Jail Call Recording 21-6160_6__51318_1923D, 00:07–00:29 ("You know [the cocaine, weed, and guns were] in that drawer where it's always at, man."); Jail Call Recording 21-6160_2__51218_1622C, 01:00–01:33 (expressing worry because the police "got them guns")).)  Viewing the evidence in the light most favorable to the government, a reasonable juror could find that Crump knew those guns were there.  *See Washington*, 702 F.3d at 891.  Also, a text message showed someone asking Crump for the Draco.[5]

Next, we have evidence that Crump exercised "dominion and control" over the apartment as well as the objects found inside.  *Moreno*, 933 F.2d at 373.  To start, Crump was the only person inside the apartment—wearing only a towel when the police saw him.  Next, under a bag of cocaine, investigating officers found Crump's birth certificate, food stamp card, mail, insurance information, flight boarding pass, parole items, and a photograph of him inside the apartment.  At bottom, a reasonable jury could find that Crump had dominion and control over the guns and ammunition in the apartment.

So in all, the "other incriminating evidence, coupled with presence" has "tip[ped] the scale in favor of sufficiency."  *Arnold*, 486 F.3d at 183 (citing *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976)).  Enough evidence proved that Crump knew about the guns and exercised dominion and control over the firearms in the apartment.  So we affirm his conviction because a rational juror could find that he actually possessed the Draco and constructively possessed the firearms and ammunition.

---

[5]Crump tries to rebut this evidence by claiming that the text from January about "AK-47s in general" does not necessarily refer to "the specific AK-47 found in the apartment" in May of the same year.  (Reply Br. at 5.)  But again, Crump cannot turn our standard of review on its head.  We must draw "every reasonable inference from the evidence . . . in the government's favor."  *Woods*, 877 F.2d at 479.

Crump has two counterarguments. Both fail. First, he asserts that the government's evidence supports only that he was present in the apartment, not that he exercised control over firearms. But he ignores all the evidence—evidence he admits to in his jail calls—that proves that he had control over the apartment and the guns therein. What Crump really wants is for the government to have provided more *direct* evidence of possession.**[6]** But it didn't have to. *Circumstantial* evidence alone can support his conviction. *Washington*, 702 F.3d at 891. And between the circumstantial evidence and Crump's own recorded admissions, any rational juror could connect Crump to the property and the firearms.

Second, Crump cites *United States v. Thomas* and argues that the government didn't prove that Crump had control of the area where the gun was found. 701 F. App'x 414 (6th Cir. 2017). But *Thomas* doesn't move the needle for him. In *Thomas*, a defendant's presence by a gun didn't establish possession. *Id.* at 418. The defendant walked into an office accessible to many employees who ate lunch, took breaks, and kept files there. *Id.* But nothing tied that defendant to the firearm in the office. *Id.* In short, *Thomas* lacked the evidence of possession that's present in this case. And with that, Crump's counterarguments on possession are unavailing.

### III.

In two ways, Crump challenges the district court's jury instructions. Each falls short. First, he argues that the court shouldn't have instructed the jury on actual possession of the Draco. Because he failed to object to the instruction at trial, we review this issue for plain error. *See* Fed. R. Crim. P. 30(d), 52(b). That standard requires an instruction to be "so clearly erroneous as to likely produce a grave miscarriage of justice." *Newsom*, 452 F.3d at 605 (citation omitted).

---

**[6]**On appeal, Crump argues that the government failed to provide certain pieces of direct evidence. He wanted the government to get someone to testify that: (1) someone saw Crump with the firearms; (2) Crump occupied the apartment; (3) no movement in or out of the apartment occurred between the time the "shots fired" call was made and when the officers arrived; and (4) Crump bled from self-inflicted wounds. (*See* Appellant Br. at 18–19; Reply Br. at 1–2.) But the government didn't have to use direct evidence *at all*. And its use of circumstantial evidence and phone recordings could lead any rational juror to find that Crump possessed the guns.

Having just affirmed his conviction because a rational juror could have concluded that he actually possessed at least the Draco, we need not spend too much time on why an instruction explaining actual possession was necessary. Crump mainly argues that no evidence supports actual possession. And he cites caselaw that makes it reversible error to provide a jury instruction on an issue when no evidence supports what's in the instruction. *See United States v. Wolak*, 923 F.2d 1193, 1198 (6th Cir. 1991); *United States v. James*, 819 F.2d 674, 675–76 (6th Cir. 1987). But for the reasons already stated, that's simply not this case.

The government provided sufficient evidence to conclude that Crump actually and constructively possessed the Draco. So the district court didn't plainly err by giving instructions on both forms of possession. In fact, doing so followed this Circuit's pattern jury instruction. *See* Sixth Circuit Pattern Criminal Jury Instructions § 2.10, Use Note (2021) ("If the government's theory of possession is that it was actual or constructive, give all paragraphs of this instruction."). So there's no error in the jury instruction on this basis, much less a plain one.

Crump's second argument is more nuanced. For the Draco, he wanted the district court to instruct that "the verdict must be unanimous as to the theory of possession and guilt."[7] (R. 148, Transcript II, p. 219.) In essence, he wanted the jury to rest unanimously on actual possession, constructive possession, or both—not any mix of the three.

Because he objected to this issue at trial, "we review the district court's refusal to give a specific unanimity instruction for abuse of discretion." *United States v. Hendrickson*, 822 F.3d 812, 822 (6th Cir. 2016). And even if the court "failed to [] give a required specific unanimity instruction, we must still engage in harmless-error review, as such a failure does not constitute structural error." *Id.* (citing *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013)).

Unanimity instructions are a method of curing "duplicitous" charges, which "set[] forth separate and distinct crimes in one count" and create a risk that a defendant's right to a unanimous verdict would be undermined "if individual jurors find [him] guilty of different crimes." *United States v. Eaton*, 784 F.3d 298, 308 (6th Cir. 2015) (quoting *United States*

---

[7]Crump's argument for the jury instruction on the Draco fails under our caselaw, as we explain. But, even if he had a viable argument on this point, any district-court error would be harmless because there was sufficient evidence for a jury to convict on the 9mm pistol alone.

*v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007)).  Here, we are dealing with one element under one crime—possession under § 922(g)—with some different means to get there.  So we have "a charge that permits more than one factual basis for conviction." *Id.*  And that charge "does not automatically require a unanimity instruction." *Id.* (citation omitted).

True enough, a jury must return a unanimous verdict.  Fed. R. Crim. P. 31(a).  But that does not mean that the jury must always be unanimous in how it gets there.  So as long as the jury reaches a unanimous verdict "that all facts that constitute 'elements' of a crime occurred," *Hendrickson*, 822 F.3d at 822–23 (citation omitted), it can reach different findings on the "several possible sets of underlying brute facts [that] make up a particular element," or as more relevant here, the "several possible means the defendant used to commit an element of the crime," *Richardson v. United States*, 526 U.S. 813, 817 (1999).  Put differently, while a jury must agree that an element is met, a jury need not unanimously decide the "brute facts" or "means" that make out that element.  *Hendrickson*, 822 F.3d at 822–23.  That's why, absent certain exceptions, "only a general unanimity instruction is required even where an indictment count provides multiple factual bases under which a conviction could rest." *United States v. Damra*, 621 F.3d 474, 504 (6th Cir. 2010).

Actual and constructive possession aren't alternative elements for Crump's conviction.  Rather, they are different ways for the government to prove an element—possession. *See United States v. Barton*, 731 F.2d 669, 673 (10th Cir. 1984) ("Actual and constructive possession are not alternative crimes under the statute.  Rather, they provide different means or theories by which the offense of 'possession' may be proved.").  It's possible that some jurors might have thought Crump had actual possession of the Draco.  Others might have thought he only constructively possessed it.  And one might have found that Crump possessed it under either theory.  "But that disagreement—a disagreement about means—would not matter as long as all [] jurors unanimously concluded that the [g]overnment had proved the necessary related element, namely, that the defendant had [possessed the Draco]." *Richardson*, 526 U.S. at 817.  In other words, the theories of possession are only tools to establish the element of possession.  And here a unanimous jury found the element, so it doesn't matter which tool they used to get there.  As a

result, nothing required Crump's proposed instruction. So the district court did not abuse its discretion in denying his request.

Further, Crump's case did not require a special instruction otherwise. That's because the three situations that warrant a special unanimity instruction don't apply. *See United States v. Miller*, 734 F.3d 530, 538 (6th Cir. 2013). Those situations are when "(1) the nature of the evidence is exceptionally complex or the alternative specifications are contradictory or only marginally related to each other; or (2) there is a variance between indictment and proof at trial; or (3) there is tangible indication of jury confusion." *Id.* (quoting *Damra*, 621 F.3d at 504–05). The government provided straightforward evidence. *Id.* And the "alternative specifications"—related to actual and constructive possession—were neither contradictory nor only tangentially related. *Id.* (citation omitted). Crump does not point out any "variance between indictment and proof at trial." *Id.* (citation omitted). Nor does he identify a "tangible indication of jury confusion." *Id.* (citation omitted). So the district court did not abuse its discretion when it denied the requested unanimity instruction.

Crump responds that the government complicated the instruction because it applied the two possession theories differently to the two weapons and ammunition. The government relied on constructive possession for both guns and the ammunition and actual possession for the Draco only. That the instruction concerned possession of either of two firearms doesn't matter. We have held that a jury need not unanimously agree on *which* gun the defendant possessed because each gun is just "the means used to satisfy the element of 'any firearm.'" *United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004) (regarding a possession over two guns in a § 922(g) case). And again, the two theories at issue are just different means to prove possession, not elements of the conviction itself. All in all, the district court didn't have to provide a special instruction.

## IV.

Crump also challenges the district court's treatment of lay witness testimony. We review evidentiary challenges like these for an abuse of discretion. *See United States v. Howell*, 17 F.4th 673, 682 (6th Cir. 2021).

Crump believes that the court "allowed a police officer, Detective Hughes, to testify as a lay witness about the meaning of Exhibit 16 as a drug ledger." (Appellant Br. at 27.) But that's not what happened. Instead, the court did exactly what Crump asks for on appeal: Not only did it exclude Hughes's testimony, it also directed the jury to disregard the testimony.

At trial, Crump's counsel objected to the admission of Detective Hughes's "so-called expert opinion" because the government didn't qualify him as an expert witness under Federal Rule of Evidence 702. (R. 147, Transcript I-B, p. 85–86.) Immediately, the court called a private bench conference "out of the hearing of the jury." (*Id.*, p. 86.) And after, the court took a break to research whether someone needs to be an expert witness to state that the "purported drug ledgers are, in fact, drug ledgers." (*Id.*, p. 87.)

After doing "some homework," the court conducted a "jury-out hearing." (*Id.*, p. 103, 109.) It wanted to determine whether the government's foundation and Hughes's testimony were admissible under Rule 701. (*Id.*, p. 109.) And it didn't want the jury there. (*Id.*)

The court settled Crump's objection in his favor. (*Id.*, p. 103–20.) Because Hughes didn't have a lot of experience with the ledgers on the job, the court found the evidence inadmissible under Rule 701. (*Id.*, p. 117 ("I'm going to exclude that testimony. So that is the [district court's] decision.").) To double-down against the testimony, the court instructed the jury to "disregard" Hughes's statement about the ledger. (*Id.*, p. 121 ("I would ask you to disregard that testimony and not give it any further thought. And the other thing is, don't even speculate as to why I'm telling you.").) Thus, no abuse of discretion could have occurred because the district court didn't admit the evidence. *See Howell*, 17 F.4th at 682.

## V.

Crump next challenges the district court's finding that he possessed the guns and ammunition "in connection with" a controlled substance offense.[8] He characterizes his challenge

---

[8]Crump frames this issue as a challenge to the four-level enhancement under U.S.S.G. § 2K2.1(b)(6). (*See* Appellant Br. 32–34.) But as the government asserts, we should instead analyze his challenge under U.S.S.G. § 4B1.4(b)(3). That's what the district court sentenced him under after all. As the PSR lays out, because Crump qualified as an armed career criminal, he gets an "enhanced sentence" under 18 U.S.C. § 924(e). So he would have

as one for procedural unreasonableness, asserting that the district court failed to demonstrate the required nexus between the drugs and the guns. But it didn't. The court adequately explained why Crump's guns were connected to the drugs and drug paraphernalia in the apartment using the fortress theory. And the caselaw Crump cites does not overcome the district court's reasonable determination.

This Court "review[s] the district court's factual findings for clear error and accord[s] due deference to the district court's determination that the firearm was used or possessed in connection with the other felony." *United States v. Shanklin*, 924 F.3d 905, 919 (6th Cir. 2019) (citation omitted). And when deciding whether "a nexus between the firearm and the felony" exists, we acknowledge "that inquiry is necessarily 'fact-specific' and thus better examined by the district court." *Id.* (citation omitted).

Courts often rely on what's called the "fortress theory" to find a nexus between drugs and guns. The theory applies "if it reasonably appears that the firearms found on the premises controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction." *Id.* at 919 (citation omitted). And when we have a drug trafficking case, our job gets easier. That's because "close proximity between the firearm and the drug materials" is all we need to uphold the enhancement. *Id.* at 920 (citing *United States v. Shields*, 664 F.3d 1040, 1045 (6th Cir. 2011)).

Courts have most commonly applied the fortress theory to sentence enhancements under U.S.S.G. § 2K2.1(b)(6). *See, e.g.*, *Shanklin*, 924 F.3d at 920 (applying the theory in accordance with Comment 14(B) of the guideline). We have not yet explicitly decided whether we can uphold a sentence under U.S.S.G. § 4B1.4(b)(3)(A) with the fortress theory. And that may be

---

an enhanced offense level of 34 if he "used or possessed the firearm or ammunition in connection with . . . a controlled substance offense"—like his drug trafficking. U.S.S.G. § 4B1.4(b)(3)(A).

The only difference between § 2K2.1(b)(6) and § 4B1.4(b)(3)(A) lies with what offense level we start with. Other than that, both enhancements use the "exact same 'in connection with' language" and apply the same way in controlled-substance cases. *United States v. Goodman*, 519 F.3d 310, 320 (6th Cir. 2008); *see United States v. McKinley*, 735 F. App'x 871, 874 (6th Cir. 2018). And under either guideline, the government has the same burden: to prove by a "preponderance of the evidence" that a defendant used a gun in connection with a felony offense. *Goodman*, 519 F.3d at 320; *United States v. Pluta*, 144 F.3d 968, 977 (6th Cir. 1998). For that reason, we can look at how the government can meet that burden in cases involving both § 4B1.4(b)(3)(A) and § 2K2.1(b)(6). *Goodman*, 519 F.3d at 320–21.

because § 4B1.4 does not contain guideline comments that discuss its application like § 2K2.1 does.

That said, whether under § 2K2.1(b)(6) or § 4B1.4(b)(3), a court's job remains the same in controlled-substance cases. It must find a nexus between guns and drugs. And again, § 4B1.4(b)(3) mirrors the language and application of § 2K2.1(b)(6). *Goodman*, 519 F.3d at 320. So we see no reason why courts can't use—as they have done already—the fortress theory in this context. *See McKinley*, 735 F. App'x at 872, 874 (implicitly evaluating a § 4B1.4(b)(3) case under the fortress theory by connecting the drugs in a car to a handgun under the driver's seat); *see also United States v. Covert*, 117 F.3d 940, 948 (6th Cir. 1997) (recognizing that sister circuits apply the fortress theory under § 4B1.4(b)(3)(A)). And importantly, Crump does not challenge the applicability of the theory to his enhanced sentence under § 4B1.4(b)(3).

So we can apply the theory in Crump's case. We've got three things here: guns, drugs, and drug paraphernalia. And they all together point to drug trafficking. We have direct and circumstantial evidence that Crump sold (and wanted to return to selling) his drugs. Knowing that the police took his "trap phone" and other "little burner phones," (Jail Call Recording 21-6160_2__51218_1622D, 00:00–00:33), his recorded admissions support that he wanted bail so he could return to drug trafficking, (Jail Call Recording 6__51318_1923C, 00:13–00:36.) After all, he was the only one who could "collect that bread" because he was "the only one who knows" his customers. (*Id.*) And Crump had 870 grams of marijuana "packaged for resale" and "a fair amount of crack cocaine as well, 28 grams." (R. 151, Sentencing Tr., p. 11.) That doesn't suggest personal consumption.

Officers also seized drug paraphernalia including digital scales, a marijuana grinder, a glass pipe with marijuana residue, rolling paper, and five cell phones. And sealing the deal, officers found the guns Crump possessed near these drugs and drug paraphernalia. So we can stop there.[9] *See Shanklin*, 924 F.3d at 920; *see United States v. Taylor*, 648 F.3d 417, 433 (6th

---

[9]The district court concluded that under the "fortress theory" Crump possessed firearms in connection with his controlled substance offense. It looked at factors like the "proximity of the firearm to the drugs, whether the defendant had an innocent explanation for the weapons, the type of firearm, [and] whether it was loaded," as well as "[t]he accessibility of the gun and the proximity of the guns to the controlled substances." (R. 151, Sentencing Tr., p. 9–10.); *see Shanklin*, 924 F.3d at 919–20. Applying those factors to Crump's case, the court reasoned that

Cir. 2011) (upholding a sentence enhancement under the fortress theory for a defendant who trafficked drugs from a house and had a gun inside the house); *United States v. Huffman*, 461 F.3d 777, 788 (6th Cir. 2006) (applying the fortress theory to a defendant who stayed at a "dope house" and had a gun and ammunition nearby).

In sum, no clear error occurred because the district court held a permissible view of the evidence. With that in mind, Crump's sentence is procedurally reasonable. The district court properly calculated the Guidelines range, didn't treat the Guidelines as mandatory, fully considered § 3553(a)'s factors, selected a sentence based on a reasonable interpretation of the facts, and adequately explained Crump's sentence. *United States v. Nichols*, 897 F.3d 729, 737 (6th Cir. 2018).

## VI.

For these reasons, we affirm.

---

"having two loaded firearms in a bedroom in an apartment with substantial drug trafficking paraphernalia would be the kind of thing that supports the applicability of the fortress theory." (R. 151, Sentencing Tr., p. 12.)

We agree. Crump had "a large and valuable stash of drugs" that the guns—located right next to them—were protecting. *United States v. Ennenga,* 263 F.3d 499, 504 (6th Cir. 2001); *see United States v. Seymour*, 739 F.3d 923, 930 (6th Cir. 2014). And we have applied the fortress theory to uphold enhancements in similar cases. *See, e.g.*, *United States v. Hardin*, 248 F.3d 489, 501 (6th Cir. 2001) (applying the theory when police found 57.5 grams of cocaine and a bag of marijuana in a bedroom with a gun); *see also Ennenga*, 263 F.3d at 504 ("When one is in possession of a large and valuable stash of drugs, the desire to protect these illicit substances can be compelling."). Given our deferential review of district-court factfinding, the quantity of drugs, how close the guns were to the drugs, and the presence of drug paraphernalia throughout the apartment, a preponderance of the evidence supported Crump's sentence. *See Shanklin*, 924 F.3d at 922.